UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )  )  v. )  )  EDUARDO ALEXANDER DANA ) | Crim. No. 1:15MJ152 |

**DEFENDANT'S OPPOSITION TO THE GOVERNMENT'S APPEAL OF THE MAGISTRATE COURT ORDER SETTING STRICT CONDITIONS OF RELEASE**

Eduardo Dana, by and through counsel, respectfully opposes the government's request to overturn the Order setting strict conditions of release issued by the Magistrate Court on August 22, 2025, pursuant to the Bail Reform Act, 18 U.S.C. § 3142. The Court should uphold the considered decision of the Magistrate Court for the following reasons.

I.   **The Magistrate Court's Hearing and Order**

   i.   **The Magistrate Court conducted a lengthy and thorough Detention Hearing at which the Magistrate Court viewed evidence of the alleged offense, questioned the third-party custodians, and carefully considered the parties' arguments.**

Eduardo Dana was presented in federal court on a complaint charging one count of 18 U.S.C. § 371 on August 21, 2025. On August 22, 2025, the Honorable Moxila A. Upadhyaya held a lengthy hearing at which the government played video clips of Mr. Dana's arrest and alleged offense. The Magistrate Court also placed Mr. Dana's two third-party custodians, Andrew Reese and Irene DeLaPaz, under oath and questioned each of them extensively. Mr. Reese is employed by the District's Department on Disability Services (DDS) and a member of the D.C Bar. Mr. Reese testified that he has known Mr. Dana for many years (Mr. Reese's adult son is a childhood friend of Mr. Dana). Mr. Reese testified that Mr. Dana has stayed at his home many times and works under him as a clerical assistant at DDS. Mr. Reese testified that Mr. Dana can be loud and

"annoying," symptoms of his mental health condition. These symptoms can be exacerbated when Mr. Dana drinks alcohol. But in all of the years that he has known him, *Mr. Reese has never known Mr. Dana to be violent or dangerous.* He has never known Mr. Dana to possess a weapon or exhibit any interest in weapons. Mr. Reese agreed to serve as third-party custodian and agreed to monitor Mr. Dana's movements, order him a ride to and from work, and check in on him routinely. Mr. Reese testified that he is aware of the consequences that could befall him were he to fail to notify the Court if Mr. Dana violates a condition of release.

Mr. Dana's case manager, Iris DeLaPaz, next testified. She too testified that she has never known Mr. Dana to be violent. She testified that Mr. Dana is a kind and funny man. Ms. DeLaPaz testified that Mr. Dana may exhibit symptoms consistent with his mental health diagnosis, but he is never threatening or dangerous. Ms. DeLaPaz testified that Mr. Dana was recently enrolled in SMYAL's housing program which includes housing and access to wrap-around services.[1] She testified that there are cameras positioned outside Mr. Dana's apartment door and that she and other staff can monitor when he comes and goes using their phones. She testified that she will either be with Mr. Dana in person or monitor him through her phone and she will notify the Court immediately if he violates any of the strict conditions imposed. Ms. DeLaPaz is prepared to take Mr. Dana to his substance abuse treatment assessment, which is scheduled on August 28, 2025. She will then help him to comply with whatever treatment is ordered.

After hearing the testimony of Mr. Reese and Ms. DeLaPaz and securing promises that they will notify the Court immediately if Mr. Dana violates any condition, the Magistrate Court released Mr. Dana and set strict conditions of release.

---

[1] Sexual Minority Youth Assistance League (SMYAL) is an organization that supports LGBTQ youth in the District of Columbia.

  **ii. The Magistrate Court issued a thorough and considered ruling**.

  At the close of evidence, the Magistrate Court issued a thorough and considered ruling. In the ruling, the Magistrate Court noted that this not a "presumption case," and that the government may have an issue proving that Mr. Dana had the requisite *mens rea* for Threats against the President. The Magistrate Court noted that the incidents that the government presented purporting to show Mr. Dana's dangerousness, while troubling, did not result in convictions and he has no record of seriously injuring anyone. The Magistrate Court noted that Mr. Dana's most recent conviction in 2021 resulted in a "stet docket," signaling that the prosecutors in that case did not consider it to be among the more serious cases. The Magistrate Court observed that this is a mental health and possible substance abuse case which requires specific conditions, which the Magistrate Court ordered. Indeed, Mr. Dana has appointments for evaluations already scheduled. Finally, the Magistrate Court emphasized that Mr. Dana is employed, and his work provides stability and an opportunity to earn an income. Mr. Dana will lose his job and his housing if he is incarcerated. In sum, Judge Upadhyaya reviewed the parties' pleadings and exhibits, carefully reviewed the evidence of the alleged offense, and extensively questioned Mr. Dana's third-party custodians. After the lengthy hearing, Judge Upadhyaya imposed strict, carefully tailored conditions of release. This Court should affirm the considered decision of the Magistrate Court and keep those conditions in place.

  II. **Relevant Background**

  On August 17, 2025, Eduardo Dana was observed damaging a light fixture outside a restaurant in the Logan Circle area in the District of Columbia. The damage Mr. Dana allegedly caused is pictured here:



In response to the damage to the light fixture, multiple Metropolitan Police Department (MPD) officers and Federal Bureau of Investigations (FBI) agents descended upon Mr. Dana—who had remained in the area—to arrest him. The bodyworn camera depicts at least four to five FBI agents and several MPD officers arresting Mr. Dana. Let that sink in: Multiple FBI armed agents were present to arrest Mr. Dana for *misdemeanor destruction of property*.[2] A crowd gathered to protest the use of more than four federal agents to arrest an unarmed man. For his part, Mr. Dana was calm and peaceful, even telling the crowd, "It's ok." He appears inebriated. Officers placed him under arrest and put him in a police car. During the entire encounter, Mr. Dana did not resist or try to run. He remained calm and peaceful.

Once inside the police car, Mr. Dana can be heard on the camera advising the officer that he is intoxicated and that he had "seven alcoholic beverages, seven wines, wine, an alcoholic beverage." He is slurring his words. He is heard asking the officer what he's being arrested for: "am I being charged with disorderly conduct?" He is also heard advising the officers that he has mental disability. The officer advises that Mr. Dana is being charged with misdemeanor

---

[2] The presence of multiple armed federal agents to effectuate a local misdemeanor destruction of property arrest is the result of the President's takeover of law enforcement functions in the District of Columbia.

destruction of property. Mr. Dana next begins to ramble and mumble, saying, "I am going to go to the restaurant and fuck the people up," to which the officer responds, "you just got another charge right there." Mr. Dana continues to ramble. He rambles, "I was just trying to go home." "They can't fuck with me." "I speak Russian and Italian." "I am not going to tolerate fascism, I am going to protect the constitution by any means necessary. If that means killing you, and killing the president, I will do that." The officer then (in a somewhat cavalier tone) radios, "call the secret service, he just made a threat against the president." Immediately after making that statement, Mr. Dana is heard loudly singing "*ba ba ba ran, ba ba ran*." Once at the station, Mr. Dana was placed in cell. Video captures Mr. Dana cordially thanking the officers.

Mr. Dana has struggled with mental health issues since he was a youth. He has experienced periods of homelessness. He is working on managing his mental health with the support of his case manager, his mentor, and his family. He currently has access to wrap-around, comprehensive services. He has stable housing. He is employed as a clerical assistant for the D.C. Department of Disability Services. Mr. Dana has never owned, let alone touched, a firearm. His case manager and his long-time friend and mentor are able to serve as third-party custodians.

Based on Mr. Dana's drunken, incoherent ramblings following his arrest for misdemeanor destruction of property, the government has charged him with Threats Against the President, in violation of 18 U.S.C. § 871 and requested that this Court overturn the Magistrate Court's considered ruling ordering release with conditions. The Bail Reform Act (BRA) mandates that pretrial detention be reserved only for cases where no combination of release conditions can reasonably assure the defendant's presence at trial or protect the safety of any other person or the community. Absent a showing by clear and convincing evidence that the defendant poses a significant flight risk or danger, detention in this case exceeds the statute's constitutional

safeguards embodied in the statute and undercuts the core presumption in favor of pretrial release that applies to every citizen.

To detain a defendant on grounds of dangerousness under the (BRA), the government must establish clear and convincing evidence "that *no* condition or combination of conditions will reasonably assure the safety of any other person and the community," 18 U.S.C. § 3142(f)(2), or, in other words, that pretrial detention is the *only* means by which the safety of the community can reasonably be assured. *United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996) (emphasis added). The government cannot meet that standard here.

This Court must consider the following factors under the BRA when determining whether the government has presented sufficient evidence that Mr. Dana be detained: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the history and characteristics of the person charged; and (4) the nature and seriousness of the danger posed by the person to any person in the community if he is released. 18 U.S.C. § 3142(g).

## ARGUMENT

**I.     The government cannot prove by clear and convincing evidence that detention is necessary.**

*i.     Nature and circumstances of the offense charged*

The nature and circumstances of Mr. Dana's purported threat to the president are fully captured on bodyworn camera of law enforcement. In the video, Mr. Dana is heard rambling and mumbling. He appears intoxicated and unserious. One moment, he is singing "ba ba ran," the next moment, he is rambling about the Russian mafia. His statements are spontaneous and idle and lack intent. While the video suggests that Mr. Dana may need treatment for alcohol abuse, it does not depict someone who is a danger to the community, let alone the president. Indeed, even as Mr.

Dana is uttering the purported threat that has given rise to the charge here, the officer appears relatively unbothered—even casual—about the statements.

    ii.    *The weight of the evidence*

The weight of the evidence that Mr. Dana committed the offense of Threats against the President is exceedingly weak. The government must show that he knowingly and willfully made threats to take the life of the president. Mr. Dana made a rambling, drunken, conditional statement, "*if* I have to kill to protect the constitution….I will." The statement is couched in between other, non-sequitur, nonsensical statements. This hardly rises to the level of a threat contemplated by the statute and the caselaw interpreting it. *See United States v. Hoffman*, 806 F.2d 703, 705 (7th Cir. 1986) (the government must establish that the communication constitutes "a true threat," rather than "idle talk.").

In *Counterman v. Colorado*, the Supreme Court held under a different threats statute that the government must not only prove that a statement is a "true threat," but also that the defendant made the threat with the requisite *mens rea*, meaning that the defendant "had some understanding of his statements" threatening character." 600 U.S. 66, 69 (2023). The Fourth Circuit has held that the *mens rea* requirement under Section 871 is even more specific: "Where a true threat against the person of the President is uttered without communication to the President intended, the threat can form the basis for a threat under Section 871(a) only if made with the present intention to do injury to the President." *United States v. Patillo*, 431 F.2d 293 (4th Cir. 1970). Finally, in *Rankin v. McPherson*, 483 U.S. 378 (1987), the Supreme Court clarified that statements not amounting to true threats, such as political hyperbole, are protected under the First Amendment and cannot be criminalized.

The caselaw interpreting 18 U.S.C. § 871 undercuts the strength of the government's

position that Mr. Dana committed the charged offense here.

    iii.    *Mr. Dana's history and characteristics.*

Mr. Dana was born in Russia and was adopted from a Russian orphanage when he was four years old. He is a high school graduate and has taken college courses. He has been diagnosed with mental health disorders which the defense has shared with the government. Mr. Dana is employed as a clerical assistant. While he has been arrested numerous times for mostly petty and dated offenses, his arrests show a pattern of someone who suffers from mental health issues but who also benefits from mental health services. His last arrest which resulted in a conviction occurred in 2021 when he was unhoused. He is currently receiving housing and services through SMYAL. The defense is prepared to present the testimony of Mr. Dana's employer and mentor, Mr. Andrew Reese, and Mr. Dana's case manager at hearing, noting that Mr. Reese cannot be present until 12 p.m. on Monday, August 25. In addition, counsel has been in touch with Mr. Dana's adoptive parents, who live in Pennsylvania. They love their son and are willing to provide what support they can.

    iv.    *The nature and seriousness of the danger posed by the person to any person in the community if Mr. Dana is released.*

The government cannot meet its heavy burden of proof by simply citing "concerns" for the safety the community. The government must present evidence proving that the defendant actually poses "an identified and articulable threat to the community," not merely that he does so in theory. *Munchel*, 991 F.3d at 1282; *see also id.* at 1286 (Henderson, J., concurring in part) (noting government has "burden to prove an unmitigable threat to public safety by clear and convincing evidence"). While the government may exercise its prosecutorial prerogative to expend federal resources on misdemeanor disorderly conduct offenses in this district, the BRA does not allow for federal detention of a someone charged with an offense where the government has failed to meet

8

its burden as here. There is no evidence that Mr. Dana presents an "identified and articulable threat to an individual or the community" and that pretrial detention is necessary to "disable the arrestee from executing that threat." *Munchel*, 991 F.3d at 1280. The BRA and the Due Process Clause demand that the Court release Mr. Dana from pretrial custody.

II. **The Magistrate Court correctly found that conditions exist that will reasonably assure Mr. Dana's appearance as required and the safety of any other person and the community.**

The Magistrate Court's conditions are set out in the Order. The conditions are extremely strict and carefully tailored. That said, should this Court find additional conditions are appropriate, Mr. Dana will comply.

## CONCLUSION

Wherefore, for the foregoing reasons, this Court should uphold the Magistrate Court's Order setting conditions of release.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
ELIZABETH MULLIN
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500