UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 1:25-mj-152-MAU |
| : | |
| EDWARD ALEXANDER DANA, : | |
| : | |
| Defendant. : | |

**RESPONSE TO COURT'S ORDERS (ECF 16, 19)**

The United States of America respectfully submits this response to the Court's orders, ECF 16, 19. For the reasons below, neither dismissal with prejudice nor any other remedy is required here. The government moved to dismiss this case because it has decided to pursue charges against the defendant in Superior Court. The Court should accordingly leave undisturbed its prior order that the federal complaint is dismissed without prejudice and the Court should take no other action.

**BACKGROUND**

On Sunday, August 17, 2025, at approximately 10:00 PM the defendant was arrested by officers of the D.C. Metropolitan Police Department for destruction of property, a D.C. Code violation, based on witness reports and surveillance video showing him damaging a light fixture outside a restaurant. ECF 1-1 ¶ 5–6. While he was being arrested, the defendant said to bystanders, "This is Donald Trump's way of saying, hey, I can look like Putin." *Id.* ¶ 6. Then on the way to the police station, the defendant said he intended to "go back there and destroy more" of the restaurant's property. *Id.* ¶ 8. The defendant elaborated, "I'm going to go back to the restaurant and fuck that person up. I'm going to beat the shit out of them, and I'm going to make

sure they remember." ECF 1-1 ¶ 8. The defendant continued, "I'm going to fuck their asses up. I'm going to destroy their property by any means necessary." *Id*. The defendant's threats then turned to the officer: "I'm going to find out who you are, where you live, who you're married to, if any. . . I'm going to make sure that many people, not just me, come after you. . . I'm going to fuck your ass up." *Id*.

After the officer informed the defendant that he would now also be charged for making these threats, another D.C. Code violation, the defendant responded, "I'm not going to tolerate fascism. You see, I was adopted [inaudible] to protect the Constitution by any means necessary. And that means killing you, officer, killing the President, killing anyone who stands in the way of our Constitution. . . You want to stand in the way of our Constitution, I will fucking kill you." *Id*. ¶ 9. After the officer asked dispatch to notify the U.S. Secret Service that the defendant had threatened to kill the President, the defendant said, "You understand me? I will happily die to protect [inaudible]. . . I will die for freedom, and I will die, happily, for the Constitution." *Id*.

On Monday, August 18, 2025, the defendant did not appear in Superior Court because he was being seen for a medical evaluation. By 11:39 PM on August 18, 2025, the defendant had been medically cleared and was placed on the Superior Court lockup list for the next afternoon, when he was scheduled to appear in Superior Court for his D.C. Code violations.

On the afternoon of August 19, 2025, United States Magistrate Judge Upadhyaya found probable cause that the defendant threatened to kill the President

of the United States and authorized a federal arrest warrant and a complaint charging the defendant with a violation of 18 U.S.C. § 871. *Id.* at 4; ECF 1 at 1. Later that afternoon, Superior Court Magistrate Judge Heide Herrmann signed a transfer over to (TOT) order, committing the defendant to the custody of the U.S. Marshals Service and ordering that the defendant be held pending his appearance in the U.S. District Court in the federal case. The U.S. Marshals Service executed the federal arrest warrant on August 21, 2025. ECF 3 at 1. And the defendant appeared before Judge Upadhyaya the same day. At that hearing, the Court detained the defendant until his detention hearing, which was scheduled the next day, August 22, 2025.

On Friday, August 22, 2025, the parties appeared for a detention hearing before Judge Upadhyaya. At the hearing, the government played portions of body-worn camera (BWC) footage showing the defendant's behavior before, during, and after the alleged threats. Before the alleged threats, the defendant was conversing calmly and rationally with the officer, commenting on the alcohol he had consumed. He was not slurring his words and was asking questions about what he was being charged with, including whether it was a felony or a misdemeanor, and whether the value of the property was more than $1,000. Roughly one minute after the alleged threat against the President, the defendant began singing; later in the evening, he was laying on the floor of the police station shouting at officers, and later still, he was naked in his cell after having removed all his clothing. Based on this evidence of intoxication, Judge Upadhyaya questioned whether the defendant was capable of forming the requisite *mens rea* for the charged offense. Nonetheless, Judge

Upadhyaya found that the defendant's conduct during and around the time of the offense, along with his criminal history and police record,[1] necessitated a strict set of conditions to assure the safety of others and the community and to ensure the defendant's continued appearance. Because it was by then too late in the day to install the Court-ordered GPS monitoring device, the Court ordered the defendant held over the weekend until Monday, August 25, 2025, when the ordered conditions could be implemented. *See* ECF 9 at 3. The Court also scheduled the preliminary hearing for September 4, 2025.

On Monday, August 25, 2025, the parties appeared before Chief Judge Boasberg for a hearing on the government's request for review of the release order. At the Chief Judge's request, the government played portions of the BWC footage beginning approximately three minutes before the alleged threat. After viewing the video, Chief Judge Boasberg declined to disturb Judge Upadhyaya's order that the defendant be released on strict conditions. Commenting on the weight of the evidence, Chief Judge Boasberg posited that "maybe" the government would obtain an indictment and "maybe" it would secure a conviction—suggesting that he viewed the

---

[1] According to Pretrial Services, the defendant has 23 prior arrests and 9 prior convictions. Among other recent incidents, the defendant has been documented (1) throwing metal objects out of a vehicle's window, yelling profanities, and defecating in front of a restaurant; (2) shouting from his SUV at pedestrians that he was going to run them over before speeding away; (3) spitting on a municipal parking-enforcement employee and tearing up parking signs; (4) breaking a glass window at a restaurant, causing himself serious injury; and (5) trying to climb the fence at an Ambassador's residence.

case as neither strong nor frivolous. The defendant was released later that day on the conditions set by Judge Upadhyaya and affirmed by Chief Judge Boasberg.

On the afternoon of Tuesday, September 2, 2025, a grand jury returned no true bill on the charge of 18 U.S.C. § 871. Later that afternoon, the parties appeared for a previously scheduled status conference at which defense counsel and the defendant were informed of the grand jury's failure to indict.

On the morning of Thursday, September 4, 2025, the government filed an information charging the defendant with offenses in Superior Court. As described in more detail below, the government promptly emailed notification of this development to defense counsel and, after receiving no response, to the Court.

At 12:30 p.m. on September 4, the parties appeared for what was scheduled as a preliminary hearing. At the beginning of the hearing, the government moved orally to dismiss the case without prejudice. In response the Court ordered this briefing.

## ARGUMENT

**A. Police, prosecutors, and judges followed the law to protect the public from the defendant, whose unconditional release endangers the community.**

Pursuant to Executive Privilege and the attorney work product and deliberative-process doctrines,[2] as recognized by the Court during the hearing on September 4, the government declines to discuss its "internal deliberations" and

---

[2] *Cf., e.g.*, *Rutigliano v. United States Dep't of Just.*, 847 F. App'x 86, 87 (2d Cir. 2021) (denying FOIA request for prosecution memorandum because "DOJ met its burden to show that the memorandum falls within the work product and/or deliberative process privileges").

"privileged attorney communications." Transcript, Sept. 4, 2025, [Sept. 4 Tr.] at 20. As ordered by this Court, however, the government offers the timeline below—in addition to the procedural history set out above—to demonstrate that it respected the rights of the defendant and moved swiftly to obtain formal charges against the defendant for his crimes.

All of the following events took place on Thursday, September 4, 2025, less than 48 hours after the grand jury's failure to return an indictment:

At 11:20 a.m., the government transmitted a Superior Court information and summons to docketing staff. The summons directed the defendant to appear at Superior Court at 1:30 p.m., a time that would correspond with his expected presence in the vicinity of the courthouse given the preliminary hearing scheduled for 12:30 p.m. The government received confirmation of receipt from court staff, and a case number indicating that the charges had been docketed, at 11:54 a.m.

Meanwhile at 11:42 a.m., although confirmation of docketing had not yet been received, the Assistant United States Attorney (AUSA) assigned to the District Court case[3] emailed defense counsel a copy of the information and summons. The email notified defense counsel that the government intended to file a motion to dismiss the pending federal complaint and requested defense counsel's agreement to cancel the preliminary hearing. Immediately after sending the email, the AUSA called defense counsel's office phone number. The AUSA was transferred to counsel's desk phone,

---

[3] This is not the same AUSA handling the Superior Court case. To transition the case between District Court and Superior Court, coordination between separate Divisions of the U.S. Attorney's Office was necessary.

where there was no answer. When the AUSA called the main office line again and asked either to be given defense counsel's cellphone number or to be transferred to it, the person who answered the phone said neither could be done.

At 12:04, not having received a response from defense counsel, the AUSA contacted chambers by email notifying the Court of the government's intention to dismiss the federal complaint and requested to cancel or postpone the preliminary hearing. This was approximately ten minutes after the government received confirmation that the Superior Court charges were docketed.

Several minutes before the hearing's start time, the AUSA met defense counsel in the courthouse hallway and verbally informed her of the government's decision.

As the above timeline demonstrates, the filing of Superior Court charges did not occur until a very short time before the preliminary hearing. Despite that fact, the government acted promptly and diligently to communicate the development to defense counsel and, when counsel did not respond, to the Court.

The Court asserted at the hearing that the defendant suffered some kind of harm for which an apology is warranted.[4] Sept. 4 Tr. at 10, 16, 20. But the defendant

---

[4] The Court specifically referenced the Justice Manual, alleging that this case presents some kind of departure from the Principles of Federal Prosecution. Sept. 4 Tr. at 20, 30; ECF 16 at 2. Of course, the Principles of Federal Prosecution "are not intended to create a substantive or procedural right or benefit, enforceable at law." Justice Manual § 9-27.150. Instead, the Justice Manual grants United States Attorneys, as the presidentially nominated and Senate confirmed representative of the United States, "plenary authority with regard to federal criminal matters" within her district. Justice Manual § 9-2.001. Indeed, the Congress has directed that the United States Attorney "shall" "prosecute for all offenses against the United States" in her district. 28 U.S.C. § 547. The United States Attorney's statutory mandate and plenary authority are expressly recognized in the Principles of Federal Prosecution,

cannot demonstrate legally cognizable harm. To begin, the defendant was lawfully held from the time of his arrest until his appearance in Superior Court based on his violations of the D.C. Code, including destruction of property and spewing threats directed at the property owner, the police officer, and the officer's family—charges the defendant must face in the Superior Court. And thereafter, a Superior Court judge and a U.S. Magistrate Judge ordered the defendant detained pursuant to a federal arrest warrant. That warrant was issued by a U.S. Magistrate Judge who found probable cause that the defendant had threatened to kill the President in violation of federal law. On the basis of that probable cause determination and federal arrest, the Congress has provided thirty days for the government to obtain an indictment or file an information charging the defendant. 18 U.S.C. § 3161.[5] During those thirty days, rule 5.1 of the Federal Rules of Criminal Procedure provides a defendant the opportunity to put the government to its burden of proof at a preliminary hearing. Fed. R. Crim. P. 5.1(c). But the rule expressly provides that the preliminary hearing need not occur until "14 days after the initial appearance if the defendant is in custody and no later than 21 days if not in custody." *Id.* In this case, the government moved much faster than the time limits imposed by the law, presenting the case to the grand jury and then, in light of the grand jury's decision,

---

which even provide that "United States Attorneys may modify or depart from the principles set forth herein as necessary in the interests of fair and effective law enforcement within the district." Justice Manual § 9-27.140.

[5] The Supreme Court has held that the government is empowered to re-present a matter for indictment after a grand jury returns a no true bill. *United States v. Thompson*, 251 U.S. 407, 413–14 (1920).

electing to proceed in the Superior Court on the D.C. Code violations, all within fourteen days from the defendant's initial appearance.

Additionally, the Congress and the rules of the court have struck a balance that protects the liberty of the accused while allowing police, prosecutors, and judges to move quickly to protect the public from people who "endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). Indeed, this is one of the fundamental obligations of our justice system. In this case, both the Magistrate Judge and the Chief District Judge who viewed a video recording of the defendant's crimes considered the following factors: "(1) the nature and circumstances of the offense charged"; "(2) the weight of the evidence against the person"; "(3) the history and characteristics of the person"; and "(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *See* 18 U.S.C. § 3142(g). And having considered those factors, both judges concluded that very strict conditions—including home detention, GPS monitoring, and two third-party custodians—were required to mitigate the danger presented by the defendant's release from custody. *See* ECF 9, 13. Those conditions also included the following:

- The Defendant is to share his location through his smartphone with [his third-party custodians] at all times.

- [A third-party custodian] is to monitor the Defendant's location while at residence during work hours and cameras when she's not at the location.

- [A second third-party custodian] is to check in with the Defendant every day over the weekends, at least once in person.

- [The second third-party custodian] is to arrange transportation for the Defendant to/from work and [that custodian] is to monitor the Defendant while traveling.

- The defendant is to conduct biweekly check-in with Magistrate Judge Moxila Upadhyaya.

- [A third-party custodian] is to administer correct medication dosage to the Defendant and ensure medication is being taken properly (in person during work hours, and via virtually outside of work hours).

- Defendant is not allowed to operate or use any vehicle and must surrender any keys to his vehicle to [the second third-party custodian].

- Defendant is to appear for a competency screening with Dr. Grant as directed by Pretrial Services.

ECF 13 at 3. Simply put, this defendant presented a danger to the community. And police, prosecutors, and judges followed the law to mitigate that danger after the defendant committed the crimes for which he was arrested—crimes for which the defendant himself appears to have apologized. Sept. 4 Tr. at 27 ("I apologize too.").

Police, prosecutors, and judges are empowered to protect the public from offenders who endanger our community. Here, the government acted to ensure the defendant's right to prompt judicial process, including an expeditious hearing before a federal grand jury to examine the merits of the charges. We acknowledge that the defendant remained in custody for a period of days while this process unfolded. However, this detention was not excessive or otherwise unfair, particularly given the need to assess the defendant's medical conditions, evaluate the charges, and protect the community during that lawful process.

**B. Dismissal without prejudice is appropriate.**

Based on its assessment of the evidence, the government brought these federal charges and sought detention of the defendant pending trial. Once the grand jury declined to indict the case, however, the government handled this case as it would

any other, i.e., by reassessing the evidence, determining whether (and where) to proceed, and then taking action to effectuate those decisions by moving to dismiss the case without prejudice. In moving to dismiss without prejudice, the government merely followed the ordinary course; we do not seek to re-bring charges arising from these events in federal court against this defendant. Accordingly, this Court should not take the extraordinary step of ordering a dismissal with prejudice.

Rule 48(a) of the Federal Rules of Criminal Procedure provides that the "government may, with leave of court, dismiss an indictment, information or complaint." The Supreme Court has explained that the "'principal object of the leave of court requirement' has been understood to be a narrow one — 'to protect a defendant against prosecutorial harassment . . . when the [g]overnment moves to dismiss an indictment over the defendant's objection.'" *United States v. Fokker Services B.V.*, 818 F.3d 733, 742 (D.C. Cir. 2016) (quoting *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977)). Therefore, a court reviews the government's motion under rule 48(a) "primarily to guard against the prospect that dismissal is part of a scheme of prosecutorial harassment of the defendant through repeated efforts to bring—and then dismiss—charges." *Fokker Services*, 818 F.3d at 742.

As a general matter, rule 48(a) allows the court to reject the government's motion to dismiss without prejudice only in "exceptional" cases due to the "strong presumption in favor of a no prejudice dismissal." *United States v. Borges*, 153 F. Supp. 3d 216, 219 (D.D.C. 2015). *See also, e.g.*, *United States v. Trump*, 757 F. Supp. 3d 82, 83 (D.D.C. 2024) ("When a prosecutor moves to dismiss an indictment without

prejudice, there is a strong presumption in favor of that course. A court may override the presumption only when dismissal without prejudice would result in harassment of the defendant or would otherwise be contrary to the manifest public interest." (citations and quotation marks omitted)).

The question of whether dismissal is with prejudice or without turns on whether the dismissal itself is being sought for an improper purpose, such as "to gain a tactical advantage" or to bring the case again under more advantageous circumstances. *United States v. Pitts*, 331 F.R.D. 199, 203 (D.D.C. 2019); *see also Rinaldi*, 434 U.S. at 30 (noting that "[t]he salient issue" in deciding whether to permit termination of prosecution under Fed. R. Crim. P. 48(a) is whether the government's "efforts to terminate the prosecution" were "tainted with impropriety"). "The key factor in a determination of prosecutorial harassment is the propriety or impropriety of the [g]overnment's efforts to terminate the prosecution—the good faith or lack of good faith of the [g]overnment in moving to dismiss." *United States v. Salinas*, 693 F.2d 348, 351 (5th Cir. 1982). *See also United States v. Hayden*, 860 F.2d 1483, 1487 (9th Cir. 1988) ("A fundamental consideration in addressing the propriety of a prosecutor's [Fed. R. Crim. P. 48(a)] dismissal motion is whether the motion is made in 'good faith.'"). "It is only when those considerations overcome the presumption that the public interest favors a dismissal without prejudice, that a dismissal shall be ordered with prejudice." *United States v. Madzarac*, 678 F. Supp. 3d 42, 48 (D.D.C. 2023).

For example, in *Pitts*, 331 F.R.D. at 204, the court denied the government's request to dismiss without prejudice where the government failed to timely seek DNA testing and sought to salvage the case by dismissing without prejudice with hopes to re-bring the prosecution once DNA test results were received. Specifically, the government advised the court that it was seeking dismissal "without prejudice in order to get the [DNA] tests done." *Id.* at 202. Because the purpose of the dismissal without prejudice "was clearly tactical, to better position the government to try this case, which is clearly prohibited under D.C. Circuit precedent," the court dismissed the case with prejudice. *Id.* at 205.

In *United States v. Poindexter*, 719 F. Supp. 6, 10 (D.D.C. 1989), the court explained that dismissal with prejudice is warranted when allowing re-prosecution "would result in harassment of the defendant or would otherwise be contrary to the manifest public interest." In *Poindexter*, the court declined to dismiss two counts of an indictment without prejudice where the government was seeking to gain a tactical advantage by preserving the possibility of re-prosecuting the defendant at a time when he would not need access to classified documents. *Id.* at 12 n.18. Similarly, in *United States v. Fields*, 475 F. Supp. 903, 905-08 (D.D.C. 1979), the court dismissed an indictment with prejudice where the government indicted the defendant in order to coerce her cooperation in another case despite knowing that its key witness—without whom the government could not prosecute the defendant—was not credible. In *United States v. Derr*, 726 F.2d 617, 619 (10th Cir. 1984), the Tenth Circuit held that dismissal with prejudice was warranted where the government sought dismissal

solely because it was dissatisfied with the state of the investigation and charges and the defendant was prepared to proceed to trial. And in *Salinas*, 693 F.2d at 353, the Fifth Circuit dismissed an indictment with prejudice on grounds that the government was engaging in harassment and improper maneuvering, when the government sought to dismiss a case on the first day of trial because it was unhappy with the jurors who had been selected.

None of the factors supporting dismissal with prejudice exist here. This is not a case where the government is requesting dismissal without prejudice in an attempt to induce a defendant's cooperation in another case, nor is it a case in which the government, for tactical reasons, has sought to defer a prosecution. Rather, here, after careful evaluation and feedback from the grand jury, the government moved to dismiss the federal complainant against the defendant without prejudice, which is the ordinary course, based on the government's exercise of its discretion to prosecute the defendant in Superior Court instead of District Court. Because the dismissal in this case is neither being requested in bad faith nor in an effort to harass the defendant, and because the government has not sought dismissal to obtain a tactical advantage or otherwise re-bring the case at a more advantageous time, the extraordinary step of ordering dismissal with prejudice is not required.

### C. No expungement or other remedy is warranted.

There is no legal or factual basis to expunge the defendant's arrest or to order any other remedy.

To begin, the defendant's record would reflect his arrest regardless of whether he was ever charged with a federal offense. The defendant was arrested for

destruction of property in violation of the D.C. Code. It was not until after he was in custody for that crime that he committed the conduct that predicated the federal complaint and made additional threats to local law-enforcement officers Given this chronology of events, the dismissal of the federal charge for threatening the President under 18 U.S.C. § 871 does not provide a basis to expunge the arrest for the D.C. Code offenses charging destruction of property and threats, which are now pending in the Superior Court.

Moreover, the Court should not take the extraordinary step of expunging the record of the defendant's arrest for the now-dismissed federal charge of threatening the President. "The power to order expungement is part of the general power of the federal courts to fashion appropriate remedies to protect important legal rights." *United States v. Archer*, Criminal No. 07-0029, 2012 WL 5818244, at *1 (D.D.C. Nov. 13, 2012). "Before expunging a criminal record, the Court must find, after examining the particular facts and circumstances of the case, the remedy is necessary and appropriate in order to preserve basic legal rights." *United States v. Davis*, No. CR. 342-72, 2006 WL 1409761, at *2 (D.D.C. May 23, 2006). In the absence of an enabling statute, a federal court's jurisdiction to hear motions to expunge convictions or arrests is limited to "the exercise of its inherent or equitable powers." *United States v. Hall*, Criminal No. 11-253-04, 2020 WL 1286386, at *2 (D.D.C. Mar. 18, 2020). The "general rule" is that "expungement of an arrest record is appropriate when serious governmental misbehavior leading to the arrest, or unusually substantial harm to the defendant not in any way attributable to him, outweighs the government's need

for a record of the arrest." *Doe v. Webster*, 606 F.2d 1226, 1231 (D.C. Cir. 1979). "Dismissal of the complaint, without more, will not justify expungement of the arrest record. Even individuals acquitted at trial are not entitled to expungement of their records 'as a matter of course.'" *Livingston v. U.S. Dep't of Just.*, 759 F.2d 74, 78 n.30 (D.C. Cir. 1985)

The D.C. Circuit has not recognized a "'standalone right to the expungement of government records.'" *United States v. Douglas*, 282 F. Supp. 3d 275, 278 (D.D.C. 2017) (quoting *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 536 (D.C. Cir. 2015)). When a court has exercised its inherent equitable power to order expungement, it has been due to "either a lack of probable cause coupled with specific circumstances, flagrant violations of the Constitution, or other unusual and extraordinary circumstances." *Doe*, 606 F.2d at 1230; *see also United States v. Blackwell*, 45 F. Supp. 3d 123, 124 (D.D.C. 2014) ("Absent a statutory basis authorizing expungement, courts have granted motions to expunge only in extreme circumstances, such as in cases involving flagrant constitutional violations.").

As former Chief Judge Howell has explained:

> Absent any statutory basis for expungement, the D.C. Circuit has held that courts nonetheless "have the inherent, equitable power to expunge arrest records . . . 'when that remedy is necessary and appropriate in order to preserve basic legal rights.'" *Livingston v. United States*, 759 F.2d 74, 78 (D.C. Cir. 1985) (quoting *Sullivan v. Murphy*, 478 F.2d 938, 968 (D.C. Cir. 1973)); *see also Doe v. Webster*, 606 F.2d 1226, 1231 n.8 (D.C. Cir. 1979) . . . .
>
> As the D.C. Circuit has recently explained, "expungement is a potentially available remedy for legally cognizable injuries." *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 536–538 (D.C. Cir. 2015). In other words, while no "nebulous right to expungement of government

records" is available, even for "government records that are inaccurate, were illegally obtained, or are 'prejudicial without serving any proper purpose,'" expungement may be an appropriate remedy where a violation of an established legal right has occurred or is imminent. *Id.* at 538 (quoting *Chastain*, 510 F.2d at 1236). Thus, expungement of a criminal record may be an appropriate exercise of equitable powers when the criminal record involved "either a lack of probable cause coupled with special circumstances, flagrant violations of the Constitution, or other unusual and extraordinary circumstances." *Webster*, 606 F.2d at 1230. Examples of such "extraordinary circumstances" provided by the D.C. Circuit include criminal records arising from prosecutions marred by entrapment, misleading law enforcement testimony or incorrect legal advice or predicated on a statute subsequently declared unconstitutional. Id. at 1230 n.11. "The general rule which emerges from the cases is that expungement of an arrest record is appropriate when serious governmental misbehavior leading to the arrest, or unusually substantial harm to the defendant not in any way attributable to him, outweighs the government's need for a record of the arrest." *Id.* at 1231 . . . .

In short, no "standalone right to expungement of government records" is recognized in this Circuit. *Abdelfattah*, 787 F.3d at 536. Instead, a prerequisite for obtaining this equitable remedy is a claimed violation of a well-established statutory or constitutional right. *Id.* at 537. Merely citing to the fact that a criminal record may foreclose or present difficulties in finding employment opportunities does not meet the fundamental prerequisite of setting out a legally cognizable claim to vindicate rights secured by the Constitution or by statute, for which claim expungement may be appropriate relief.

*Douglas*, 282 F. Supp. 3d at 277–78.

The circumstances of this case differ radically from those where expungement has been granted. For example, in *Tatum v. Morton*, 562 F.2d 1279, 1285 (D.C. Cir. 1977), the district court expunged the arrests of attendees at a peaceful Quaker prayer vigil outside of the White House because the arrests violated the First Amendment. In *Sullivan v. Murphy*, 478 F.2d 938, 968-69 (D.C. Cir. 1973), the D.C. Circuit expunged the mass arrests of May Day protesters of U.S. military

involvement in Southeast Asia, "where the police could not have furnished evidence of probable cause if a judicial hearing had been held promptly after apprehension." In *United States v. McLeod*, 385 F.2d 734, 749-50 (5th Cir. 1967), the Fifth Circuit expunged arrest records and ordered the return of fines collected from a group of civil rights workers who had been arrested and convicted in state courts in an effort to disrupt a voter registration drive. In *Bilick v. Dudley*, 356 F. Supp. 945, 949, 953 (S.D.N.Y. 1973), the court expunged a mass arrest that violated the First Amendment because the arrests were made by police to harass a group due to their political beliefs. In *Hughes v. Rizzo*, 282 F. Supp. 881, 882-83, 885 (E.D. Pa. 1968), the court expunged arrest records that were the result of a campaign by local police to discourage youths from congregating in a public park, where police conducted mass arrests but did not initiate criminal proceedings. And in *Wheeler v. Goodman*, 306 F. Supp. 58 (W.D.N.C 1969), *vacated on other grounds*, 401 U.S. 987 (1971), the court expunged municipal arrest records upon a showing that police had committed repeated Fourth Amendment violations while enforcing a state vagrancy law that the court found unconstitutionally overbroad. The court explained that while "[we] do not hold that expunction is appropriate every time a defendant is acquitted or released without prosecution . . . on the facts of this case, including the youth of the plaintiffs, their innocence of any crime, the extreme misbehavior of the police in making arrests without probable cause, and the absence of any benefit to society in the maintenance of the arrest records," expungement was warranted. *Id.* at 66.

This case is nothing like those. There has been no constitutional violation, let alone a "flagrant" violation, and no other extraordinary circumstances. Specifically, a fair viewing of the full BWC footage establishes that there was, and is, probable cause to charge the defendant with making threats, including threats against the President. While the apparent effects of alcohol are an appropriate factor to consider, the defendant did not begin showing signs of severe intoxication until after he had already made multiple threats and learned that the threat against the President would be reported to the Secret Service. In the leadup to the threat, by contrast, the defendant was coherent and lucid. He posed detailed questions about his charges and made very specific threats to return to the scene of his property-damage crime and inflict bodily harm on the people there. Within that context, the likelihood that the defendant's statement about the President qualified as a threat under § 871 was sufficient to meet the probable-cause standard. Thus, Judge Upadhyaya was right to sign the complaint, and the government acted reasonably in charging the threats offense. Although the federal grand jury returned a no-bill as to the threats against the President, this fact does not suggest any governmental bad faith in lodging the federal charge. The government's decision to proceed in the Superior Court after the federal grand jury returned a no-bill on the federal charges also does not suggest any bad faith or nefarious intent. To the contrary, the government's charging decision respects the federal grand jury's decision while it also vindicates the need to hold the defendant accountable for his criminal conduct. The decision to proceed in one jurisdiction rather than another is not an admission of error, but rather an

appropriate exercise of the United States Attorney's discretion to prosecute the case in the manner best calculated to achieve a just result and protect the public's safety.[6]

Public policy also militates against sealing the record of defendant's arrest. The Superior Court charges — including misdemeanor charges of threatening the President and others — are still pending. Moreover, expungement of the defendant's arrest for making threats to the President would impair the ability of the Secret Service and other law-enforcement agencies to protect the President, who has already faced two significant assassination attempts, from persons willing to cause him harm.

## CONCLUSION

For the foregoing reasons, the Court should leave undisturbed its prior order that the federal complaint is dismissed without prejudice and the Court should take no other action.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Jonathan R. Hornok*
JONATHAN R. HORNOK
Assistant United States Attorney
Criminal Chief
601 D Street NW
Washington, D.C. 20530
(202) 252-7566
Jonathan.Hornok@usdoj.gov

---

[6] Among other things, a Superior Court charge comes with the possibility of the defendant's case being handled through the Mental Health Community Court.